DECISION
{¶ 1} Relator, Sherman Perry, Jr., has filed an original action in mandamus requesting this court to issue a writ of mandamus to order respondent, Industrial Commission of Ohio, to vacate its order that denied his application for permanent total disability compensation, and to enter an order granting such compensation.
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Section (M), Loc.R. 12 of the Tenth District Court of Appeals, who rendered a decision including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate decided the requested writ of mandamus should be denied. Relator has filed objections to the magistrate's decision.
 {¶ 3} In his objections, relator essentially repeats the same arguments that were fully considered and rejected by the magistrate. Although relator argues there is no evidence of his intellectual ability to do sedentary work, nonetheless, there is some evidence that relator maintained employment for over 40 years and obtained promotions moving from a laborer to an operator of equipment/trucks, showing an ability to learn new skills through on-the-job training. Further, relator can read, write and do basic math.
 {¶ 4} Upon a review of the magistrate's decision and an independent review of the file, this court adopts the magistrate's decision as its own. Relator's objections to the magistrate's decision are overruled and the requested writ of mandamus is denied.
Objections overruled, writ of mandamus denied.
PETREE, P.J, and LAZARUS, J., concur.
 IN MANDAMUS {¶ 5} In this original action, relator, Sherman Perry, Jr., requests a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its order denying him permanent total disability ("PTD") compensation and to enter an order granting said compensation.
Findings of Fact:
 {¶ 6} 1. Relator sustained three industrial injuries while employed as an "equipment operator" for the city of Columbus. On August 27, 1990, relator fell as he was stepping down from his dump truck. The injury is allowed for "torn left knee medial cartilage; osteoarthritis nos — lower left leg" and is assigned claim No. PEL95441.
 {¶ 7} 2. On March 27, 1995, relator sprained his thoracic region while throwing debris into a pickup truck. The claim is allowed for "sprain thoracic region" and is assigned claim No. 95-377862.
 {¶ 8} 3. On June 3, 1996, relator was involved in an automobile accident while at work. The claim is allowed for "contusion left shoulder region, sprain thoracic region, sprain of neck, Tietze's disease" and is assigned claim No. 96-499509.
 {¶ 9} 4. Relator had two arthroscopic surgeries on his left knee. The first in 1990, and the second in 1999 when he last worked for the city of Columbus. He apparently received temporary total disability ("TTD") compensation following the 1999 surgery. Effective February 7, 2001, the commission terminated TTD compensation on grounds that the August 27, 1990 injury had reached maximum medical improvement ("MMI"). In its order finding MMI, the commission stated:
 {¶ 10} "* * * [T]he claimant currently receives conservative medical treatment of weekly office visits, heat treatments and medication. The claimant's last surgical procedure was in 08/99. There is no current request for additional surgery at this time. * * *"
 {¶ 11} 5. On December 17, 2001, relator filed an application for PTD compensation. In support, relator submitted a report, dated October 3, 2001, from his treating physician, J. Quinn Dorgan, Jr., M.D., who opined:
 {¶ 12} "* * * I find the above patient to be permanently and totally disabled and unable to perform any sustained remunerative employment, as a direct and proximate result of the work related injuries."
 {¶ 13} 6. In further support of his application, relator submitted a vocational report, dated May 22, 2001, from Beal D. Lowe, Ph.D. Dr. Lowe administered tests and reported:
 {¶ 14} "A Short Form of the WAIS-R was administered to screen for general intelligence. This assessment finds Mr. Perry to have a full-scale IQ of approximately 75, placing him in the Borderline Range (lowest 7%).
 {¶ 15} "The Wide Range Achievement Test-3 was administered to assess Mr. Perry's reading abilities. This instrument finds him to be reading at the 4th grade level."
 {¶ 16} 7. Dr. Lowe concluded:
 {¶ 17} "As a 62-year-old man, with Borderline intelligence and 4th grade level academic abilities and who completed only the 8th grade, Mr. Perry is found to lack capacity to perform any Sedentary retail or clerical occupations. In light of his age and Borderline intelligence, Mr. Perry is found not to be a candidate for rehabilitation or retraining."
 {¶ 18} 8. On March 19, 2002, relator was examined by commission specialist and physiatrist, Timothy J. Fallon, M.D. Dr. Fallon wrote:
 {¶ 19} "From the standpoint of this gentleman's allowed conditions at this time, they are stabilized and MMI. From the standpoint of the contusion of the left shoulder region, I am not finding any residual impairment. From the standpoint of the sprain of the thoracic region and sprain of the neck, these would be represented by a Cervicothoracic Category II or a 5% whole person impairment. From the standpoint of this gentleman's left knee condition, this is one which is stabilized and MMI as well and results in significant residuals and at this point in time would represent a 20% whole person impairment. He would be a candidate for a total knee arthroplasty and could have improved function subsequent to that.
 {¶ 20} "This gentleman would be unable to return to his former work activity as a heavy equipment operator. He would be capable only of sedentary types of strength endeavors. Using the AMA Combined Value Chart, this gentleman would have a 25% whole person impairment."
 {¶ 21} 9. The commission requested an employability assessment report from Lynne Kaufman, a vocational expert. The Kaufman report, dated April 19, 2002, responds to the following query:
 {¶ 22} "Based on your separate consideration of reviewed medical and psychological opinions regarding functional limitations which arise from the allowed condition(s), identify occupations which the claimant may reasonably be expected to perform, immediately and/or following appropriate academic remediation."
 {¶ 23} Indicating acceptance of Dr. Fallon's report and responding to the above query, Kaufman wrote:
 {¶ 24} "Very limited light: small product assembler inspector.
 {¶ 25} "Limited sedentary: document preparer, microfilming, stuffer, preparer, surveillance system-monitor."
 {¶ 26} The Kaufman report further states:
 {¶ 27} "III. EFFECTS OF OTHER EMPLOYABILITY FACTORS
 {¶ 28} "1. Question: How, if at all, do the claimant's age, education, work history or other factors (physical, psychological and sociological) effect his/her ability to meet basic demands of entry level occupations?
 {¶ 29} "Answer: Age: Would expect some difficulty adapting to new entry level occupations. Is close to retirement age. Dr. Randolph reports Mr. Perry has `taken regular retirement.'
 {¶ 30} "Education: Is limited with the injured worker reporting he can read and do basic math but not write well. Dr. Lowe reports reading to be at 4th grade level. Jobs requiring more than basic reading and writing would likely be eliminated.
 {¶ 31} "Work History: Has primarily operated trucks and forklifts with no transferability into the sedentary strength range.
 {¶ 32} "Other: Mr. Perry, Jr. is reported to be receiving retirement which may act as a disincentive to return to work. He reports using a cane to walk which may reduce carrying ability. Dr. Fallon recommends a total knee arthroplasty.
 {¶ 33} "2. Question: Does your review of background data indicate whether the claimant may reasonably develop academic or other skills required to perform entry level Sedentary or Light jobs?
 {¶ 34} "Answer: Academic and skill remediation are not precluded but appear unlikely due to age and adaptation issues. Likely to do best in on-the-job type training.
 {¶ 35} "3. Question: Are there significant issues regarding potential employability limitations or strengths which you wish to call to the SHO's attention?
 {¶ 36} "Answer: Mr. Perry, Jr. has indicated no interest in vocational rehabilitation. He would not be considered a good candidate due to age, education and prior work."
 {¶ 37} 10. Following a June 11, 2002 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order states:
 {¶ 38} "The Staff Hearing Officer finds that the Injured Worker retains the residual physical capacity to engage in unskilled sedentary employment.
 {¶ 39} "In finding that the Injured Worker is not permanently and totally disabled, the Staff Hearing Officer relies upon the medical report of Dr. Timothy J. Fallon, M.D., dated 03/20/2002.
 {¶ 40} "The Injured Worker is a 63 year old man who completed the 8th grade. He did not return to school to obtain a general equivalency diploma or vocational training. The records shows a work history starting in 1959 and ending in 1999. At hearing Injured Worker testified that he can read and do basic math but not write well.
 {¶ 41} "After being employed for 40 years, the Injured Worker left the workforce at age 61. His employment history consisted of a variety of positions such as laborer in steel mill (2 years), gas station laborer/oil changer (3 years), laborer/steel (1 year), forklift/fork truck driver (22 years) and equipment operator/drove trucks (10 years).
 {¶ 42} "The record shows that the Injured Worker sustained three industrial injuries with the City of Columbus. On 06/03/1996, his truck was involved with a motor vehicle accident; on 08/27/2002 [sic] he stepped down, missed the running board and fell; on 03/27/1995 he lifted a bag of debris and strained his upper back. The claims were allowed for the conditions noted in this order.
 {¶ 43} "Medical treatment in this claim has been somewhat conservative. The Injured Worker has two left knee surgeries. According to Dr. Fallon, he is a candidate for total knee replacement; however, he has yet to decide to have the procedure. He currently uses a cane.
 {¶ 44} "On 03/19/2002 Dr. Timothy J. Fallon, M.D. (Physiatrist) examined the Injured Worker on behalf of the Industrial Commission to determine whether he retains the residual physical capacity to engage in sustained remunerative employment. He found that the Injured Worker had reached maximum medical improvement with respect to all the allowed conditions. He found that the Injured Worker could not return physically to work as an equipment operator; however, he retains the residual physical capacity to perform sedentary types of strength endeavors. He has a 25 percent whole person impairment.
 {¶ 45} "It is the order of the Staff Hearing Officer that the Injured Worker's Application for Permanent and Total benefits is denied for the reasons set forth in this order.
 {¶ 46} "The Staff Hearing Officer finds based upon Dr. Fallon's medical report that the Injured Worker retains the residual physical capacity to engage in unskilled entry level employment.
 {¶ 47} "The Injured Worker is a 63 year old male who has a strong work ethic. He had been in the workforce for 40 years. The record indicates that he has a limited education; he only completed the 8th grade. Notwithstanding his limited education, he managed to maintain employment for 40 years. He learns the job duties that were required of him by on the job training. At his last place of employment he started as a laborer but applied for another position as an equipment/truck operator and was awarded the job. Before obtaining employment with the City of Columbus, he had been employed at Westinghouse for 20 years. He learned to drive various trucks and forklifts while employed.
 {¶ 48} "The Staff Hearing Officer finds that the Injured Worker has the intellectual ability to learn new tasks and skills with on the job instruction. He has demonstrated this ability by performing various positions while he was in the workforce. The Injured Worker testified that he could read and perform basic math but does not write well.
 {¶ 49} "The Staff Hearing Officer finds that the Injured Worker has the skills necessary to seek and maintain employment relationships. He has demonstrated this ability by securing different positions and maintaining long term employment while in the workforce.
 {¶ 50} "Dr. Fallon opined that the Injured Worker retains the residual physical capacity to engage in sedentary type employment.
 {¶ 51} "The Staff Hearing Officer finds that the Injured Worker could easily perform the job duties of airport van driver who goes from stop to stop picking up passengers to take to the terminal. The Staff Hearing Officer also finds that the Injured Worker could perform/learn to perform sit down cashier job at a parking garage. The Injured Worker has the ability to perform basic math, further most machines tell the cashier how much change to give back. The Staff Hearing Officer finds that the Injured Worker could perform sit down small assembler of small parts.
 {¶ 52} "The Staff Hearing Officer finds that the Injured Worker could seek help securing employment by contacting Special Service Agency that help secure employment for workers over the age of 55. The record does not indicate that the Injured Worker has sought out this service. He could also contact the Bureau of Vocational Rehabilitation (B.V.R.) for help in securing employment through on the job training and placement.
 {¶ 53} "It is for the reasons noted that the Application for Permanent and Total benefits is denied."
 {¶ 54} 11. On August 12, 2002, relator, Sherman Perry, Jr., filed this mandamus action.
Conclusions of Law:
 {¶ 55} It is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 56} For its threshold medical determination, the commission, through its SHO, relied exclusively upon the report of Dr. Fallon, who found that relator is medically able to perform sedentary employment. Relator does not challenge the report of Dr. Fallon nor the commission's determination that relator is medically able to perform sedentary employment. However, relator does challenge the commission's analysis of the non-medical factors.
 {¶ 57} Analysis here begins with the observation that the commission set forth its own analysis of the non-medical factors in its order. It did not rely upon the vocational conclusions of any of the vocational reports of record. It was within the commission's discretion, as the expert on the non-medical factors, to do so. State ex rel. Jackson v. Indus. Comm. (1997), 79 Ohio St.3d 266.
 {¶ 58} According to relator, the commission "reached the unreasonable conclusion" that he has the intellectual ability to learn new tasks and skills with on-the-job instruction. (Relator's brief at 7.) The magistrate disagrees. A pertinent paragraph from the order states:
 {¶ 59} "The Staff Hearing Officer finds that the Injured Worker has the intellectual ability to learn new tasks and skills with on the job instruction. He has demonstrated this ability by performing various positions while he was in the workforce. The Injured Worker testified that he could read and perform basic math but does not write well."
 {¶ 60} In the paragraph previous to the above quoted one, the commission noted that relator had "managed to maintain employment for 40 years." He learned the job duties required of him by on-the-job training. At his last place of employment (city of Columbus), he started as a laborer but applied for another position as an equipment/truck operator and was awarded the job. He also learned to drive various trucks and forklifts while employed.
 {¶ 61} As the above quoted paragraph from the commission's order readily indicates, a key finding was made regarding relator's intellectual ability. The commission reasoned that relator has demonstrated some intellectual ability to learn new tasks and skills during his 40-year work history. The commission's reasoning is adequately set forth and supported by some evidence. Contrary to relator's suggestion (Brief at 7), the commission was not bound by Dr. Beal's testing results nor Dr. Beal's opinion that relator's intelligence quotient is in the "borderline" range.
 {¶ 62} It was clearly within the commission's fact-finding discretion to determine that relator's work history is a better indicator of his intellectual ability than Dr. Beal's test results.
 {¶ 63} Ohio Adm. Code 4121-3-34(B)(3)(c)(iv) states:
 {¶ 64} "(iv) `Transferability of skills' are skills which can be used in other work activities. Transferability will depend upon the similarity of occupational work activities that have been performed by the claimant. Skills which an individual has obtained through working at past relevant work may qualify individuals for some other type of employment."
 {¶ 65} Here, the commission did not find transferability of skills in the traditional sense. However, the commission did find that relator has "the skills necessary to seek and maintain employment relationships. He has demonstrated this ability by securing different positions and maintaining long term employment while in the workforce." In short, the commission viewed relator's long-term stable employment positively rather than negatively. This also was within the commission's fact-finding discretion.
 {¶ 66} In State ex rel. Ewart v. Indus. Comm. (1996),76 Ohio St.3d 139, the court noted that non-medical factors are often subject to different interpretation. In Ewart, the claimant's work history was subject to different interpretation. The Ewart court states, at 142:
 {¶ 67} "* * * Claimant worked for Refiners Transport and Terminal as a trucker for twenty-two years. Claimant's long tenure can be viewed negatively because it prevented the acquisition of a broader range of skills that more varied employment might have provided. It also, however, suggests a stable, loyal and dependable employee worth making an investment in. This is an asset and is an interpretation as valid as the first."
 {¶ 68} The same is true here. Relator wanted the commission to view his work history negatively because it apparently did not produce transferability of skills in the traditional sense. However, the commission saw relator's work history differently than did relator. Here, the commission appropriately weighed the evidence regarding relator's work history and drew reasonable conclusions therefrom.
 {¶ 69} Relator also asserts that the commission "impos[ed] a duty" upon him to seek out help from a so-called "Special Service Agency." (Relator's brief at 8.) Relator then asserts that this alleged imposed duty contradicts the commission's expert's opinion that relator "would not be considered a good candidate [for vocational rehabilitation] due to age, education and prior work." Relator seems to suggest that the commission imposed a duty for which the failure to perform merits automatic denial of the application. The magistrate disagrees that the commission's order can be interpreted as effectively imposing an absolute duty on relator to seek the help of a special service agency. Moreover, any inconsistency between the Kaufman report and the commission's order is irrelevant, given that the commission did not rely upon the Kaufman report.
 {¶ 70} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.